IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

LAWRENCE SARLO and SUSAN SARLO,

Plaintiffs,

v.

WELLS FARGO BANK, N.A.

Defendant.

HONORABLE JEROME B. SIMANDLE

Civil No. 12-5522 (JBS/KMW)

**OPINION**

APPEARANCES:

Michael H. Gaier, Esq.
SHAFFER & GAIER, LLC
21 Ellis Street, Suite 200
Haddonfield, NJ 08033
    Attorney for Plaintiffs Lawrence Sarlo and Susan Sarlo

Barbara K. Hager, Esq.
REED SMITH LLP
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
    -and-
Derek J. Baker, Esq.
REED SMITH
Princeton Forrestal Village
136 Main Street, Suite 250
Princeton, NJ 08540
    -and-
Jenai H. St. Hill, Esq.
REED SMITH LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103
    Attorneys for Defendant Wells Fargo Bank, N.A.

**SIMANDLE**, Chief Judge:

I.   **INTRODUCTION**

    Plaintiffs Lawrence and Susan Sarlo bring this action

against Defendant Wells Fargo Bank, N.A., alleging that Defendant induced Plaintiffs to stop making their monthly mortgage payments so that Plaintiffs could qualify for a loan modification, but later foreclosed on Plaintiffs' home without ever providing the promised modified loan or even evaluating Plaintiffs for the modified loan. Plaintiffs allege, among other things, breach of contract, breach of the implied covenant of good faith and fair dealing, negligent representation, slander of credit, and violation of the New Jersey Consumer Fraud Act. Defendant has filed for summary judgment. Because a reasonable factfinder could conclude on the evidence that Defendant agreed to assess Plaintiffs' eligibility for a loan modification and failed to properly do so, the Court will allow Plaintiffs' claims for breach of contract and violation of the New Jersey Consumer Fraud Act to proceed upon these aspects of Plaintiffs' contract and Consumer Fraud Act claims, and will grant summary judgment on the remaining claims.

## II.  BACKGROUND

### A. Summary Judgment Record

The Court begins with the summary judgment record.

Plaintiffs Lawrence and Susan Sarlo have owned a home in Wildwood, New Jersey since 2002. In 2003, they decided to refinance their mortgage to obtain a lower interest rate and executed a promissory note and mortgage in the sum of $288,000,

with an annual interest rate of 6.25% and monthly payment of $1,773.27. (Note, Def. Ex. A [Docket Item 19-9]; Def. Statement of Material Facts ("SMF") ¶ 1; Pl. Counter Statement of Facts ("Counter SMF") ¶¶ 27-28.)[1]

Plaintiffs paid their monthly installment payments in accordance with the terms of the mortgage for approximately six years until 2009. (Counter SMF ¶ 29.) According to Defendant Wells Fargo, the loan entered into default on January 1, 2009. (Cert. of Alissa Deopp. ("Deopp Cert.") [Docket Item 19-8] ¶ 18.)

On February 6, 2009, Plaintiff Lawrence Sarlo called Wells Fargo to ask about refinancing their loan to lower their monthly mortgage payments. A Wells Fargo representative told Plaintiff that he was "pre-qualified" for a loan modification. (Rowles Dep., Pl. Ex. D [Docket Item 22] 39:17-19; Counter SMF ¶ 32.) He explained that there was a new program "put forth by Obama" that would allow Plaintiffs to "lower [their] interest rate and spread the loan out over a longer period of time." (Lawrence Sarlo Dep., Pl. Ex. B [Docket Item 22], 73:22-75:4.)[2] According to Sarlo, the representative told him that the interest rate

---

[1] The mortgage was assigned to Defendant Wells Fargo Bank, N.A. ("Wells Fargo") on June 2, 2009. (Assignment of Mortgage Notice, Def. Ex. C to Deopp Cert. [Docket Item 19-11]; SMF ¶ 3.)
[2] The page numbers from the Lawrence Sarlo deposition are taken from the page numbers indicated at the top of the filing at Docket Item 22.

3

would be as low as two and-a-half percent, which Plaintiffs wanted because it would decrease their monthly loan payment. (Id. 77:18-78:7.) Plaintiff testified,

> . . . I asked him what we need to do to be part of that program, and he told me that I had to pay a fee of $2200 and some odd dollars which was more than my mortgage payment. And I had to stop making my payments for my mortgage. And I questioned him. Why would I have to stop making my mortgage payments? He said, It's part of the program. Don't worry.

(Id. 75:5-12.) Plaintiff Susan Sarlo also testified that her husband told her Wells Fargo "said we would have to stop making payments on our mortgage." (Susan Sarlo Dep., Def. Ex. 3 [Docket Item 19-6] 9:18-20.)

A loan verification analyst for Defendant Wells Fargo, Susan Rowles, testified that a review for a loan modification would not be made "unless there was a delinquency," and that "delinquency was one of the requirements" for loan modification. (Rowles Dep. 42:4-6; 43:13-16.) When asked whether Defendant would instruct representatives "to encourage borrowers to be delinquent in the mortgage payment if they wanted to get a loan modification," Rowles answered no. (Id. 47:2-7.) When asked whether representatives would be "acting within [their] authority at Wells Fargo" if they told borrowers "that they could get a loan modification if their loan were delinquent," Rowles testified, "Well, that's a fact. . . . If the loan was delinquent you can get a modification. It does not mean not to

pay your payment. It's not the same thing, so that would just be stating a fact." (Id. at 47:11-21.)

According to Wells Fargo's notes regarding the phone call, Plaintiffs were pre-qualified for a loan modification "based on verbal information provided by [Plaintiffs]" and were set up for loss mitigation. (Id. 38:13-18.) The notes also stated, "Informed borrower that terms are not final. Terms may vary upon review and will be reviewed for modification." (Id. 35:25-36:2.) At Plaintiffs' request, Defendant sent Plaintiffs a follow-up letter regarding the loan modification. The letter stated that Defendant was "considering a program that may assist you in curing the delinquency on your loan." The program "would reschedule your loan balance to set up a new payment and provide you with the opportunity for a fresh start." The letter went on to explain,

> Please be advised this letter is not a guarantee or approval of the loan modification. An initial payment of [$]2415.00, that is due on 2009-02-25. . . . If you are not approved for a loan modification, the initial payment will be returned to you. Once Wells Fargo receives the item listed above, we will complete an analysis of your situation and seek the appropriate approvals. . . . If the modification is approved, you will receive additional information that explains the terms of the agreement . . . .
>   Please note that until such time as you are approved for a modification, normal default servicing will continue which includes any foreclosure action that may be in process. . . . You are responsible to pay any fees associated with this action that continue to accrue until your loan modification is approved.

(Feb. 6, 2009 Letter, Def. Ex. E [Docket Item 19-3].)

Plaintiff Lawrence Sarlo testified that he gave Defendant information over the phone about his income but Defendant never asked for documents, which they were prepared to send in. Sarlo also did not recall having to sign anything. (Lawrence Sarlo Dep. 76:17-77:3; 78:18-23; 79:6-12 ("I don't think there was anything to sign, no. It was just that check.").) Defendant only asked Plaintiffs to send a check for $2,415.00, which they did at the end of February 2009. (Pl. Ex. C [Docket Item 22].) The check was placed in a suspense account pending review for loan modification. (Rowles Dep. 48:17-59:11.)

Plaintiffs were told that they would hear from Defendant about the loan modification in six to twelve weeks and in the meantime stopped their monthly loan payments while they waited for a response. Plaintiffs called several times to find out if Defendant needed any additional information but were told to "just be patient." (Lawrence Sarlo Dep. 76:11-21.)

At some point between February and June, Defendant offered Plaintiffs a loan modification over the phone. The loan required monthly payments of approximately $2600, which Plaintiffs turned down because it was higher than their original payment. (Lawrence Saro Dep. 79:11-19; Counter SMF ¶ 6.) Defendant told Plaintiffs to write a letter declining the modification, which Plaintiffs did, and Defendant would "reevaluate" them anew. (Id.

6

79:19-80:17.)

Rowles testified that Plaintiffs were evaluated for and denied the Home Affordable Modification Program ("HAMP") in or around April 2009. (Rowles Dep. 59:22-24.) Sarlo stated that he had never heard of the term "HAMP" and had never discussed a HAMP loan with Defendant. There are no documents in the record showing that Plaintiffs received notification that they were evaluated for a HAMP loan.[3]

Defendant filed a foreclosure action on June 3, 2009; however, Lawrence Sarlo testified that in early June, he called Defendant and told the representative on the phone that he and his wife were still "waiting for a decision" about the loan modification. (Id. 78:11-13.) Defendant's representative told him that he and his wife did not qualify for a loan modification because they earned too much money, but that response may have been based on incorrect income information from another borrower. (Id. 78:15-17.) According to Sarlo, Defendant's representative told him that he was not qualified for loan modification because Sarlo and his wife made $12,500 a year when in fact they made much less. Sarlo told the representative his true income and the representative told him that she "had [his]

---

[3] Plaintiff asserts that his claims are not based on the denial of a HAMP loan because he never received anything about HAMP. (Counter SMF ¶ 6.)

file mixed up with somebody else's." (Lawrence Sarlo Dep. 78:24-79:5.)

Defendant sent Plaintiffs a letter dated June 2, 2009, offering them a "HomeSaver Advance" loan for the purpose of "pay[ing] off past due payments to bring the account current." (June 2, 2009 Letter, Def. Ex. D [Docket Item 19-12], at 8.) The loan covered five months' delinquent mortgage payments and fees incurred as a result of the delinquency, which together totaled $14,929.25. (Id. at 4.) The loan required monthly payments of $120.80 at a yearly interest rate of 5%. According to the Frequently Asked Questions published by Defendant, a HomeSaver Advance loan "does not affect the original mortgage at all" and "is independent from [the] primary mortgage note." (Id. at 8.) Defendant asserts that Plaintiffs rejected this offer. (SMF ¶ 7.) Plaintiff Lawrence Sarlo did not recall seeing the HomeSaver Advance letter. (Lawrence Sarlo Dep. 101:23-102:6.)

On June 3, 2009, one day after Wells Fargo offered Plaintiffs the HomeSaver Advance loan, Defendant filed a mortgage foreclosure action in the Superior Court of New Jersey. (SMF ¶ 8.) Defendant did not return Plaintiffs' check for $2,415.00 before filing for foreclosure. (Counter SMF ¶ 5.) Nothing in the record suggests that Plaintiffs ever received their deposit back, and Defendant has not stated that the fee was ever returned to Plaintiffs. Plaintiffs' previous attorney,

who represented them in the foreclosure action, failed to keep Plaintiffs abreast of the lawsuit. (Sarlo Cert., Pl. Ex. E [Docket Item 22] ¶¶ 6-8.) On September 3, 2009, the Superior Court entered default judgment in favor of Defendant Wells Fargo. The action is presently stayed in the Office of Foreclosure pending resolution of this case. (SMF ¶¶ 11-12.)[4]

Plaintiff Lawrence Sarlo testified that since the events in 2009, he and his wife have had many sleepless nights and "have been put through literally hell." (Lawrence Sarlo Dep. 97:16-19.) He stated, "Between us arguing over the finances, us, me trying to figure out a way to just get this done and over with. . . . As far as I'm concerned, it was the worst phone call in my life." (Id. 97:20-24.) Plaintiffs did not seek medical treatment for the emotional distress caused by the incident. (Id. 98:1-18.)

Sarlo also testified that as a result of these events, he and his wife have been unable to secure college loans for their

---

[4] Before obtaining an attorney to represent them, Plaintiffs filed an answer in which they wrote that when they first called Wells Fargo to discuss refinancing, "no help was even entertained at that time other than 'only if you are late.'" (Lawrence Sarlo Dep. 87:17-23.) Plaintiff Lawrence Sarlo stated that although the phrase "only if you are late" was written in quotations, it was not a direct quote from the representative he spoke with, but was Sarlo's interpretation of the representative's statement that he needed to stop making payments. (Id. 90:13-21.) Sarlo stated that he placed the phrase in quotations to "highlight[] just an interpretation on my side and what I was saying." (Id. 91:12-14.)

children, their credit score has declined, and their credit card interest rates and minimum payments have risen. (Id. 83:3-5; 84:4-20.)

**B. Procedural Background**

Plaintiffs Lawrence and Susan Sarlo filed their Complaint against Wells Fargo Bank, N.A. in this Court on September 4, 2012 [Docket Item 1]. The Complaint asserts violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 (Count Five); the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605 (Count Eight), and seven claims under New Jersey law.

Defendant filed for summary judgment on all counts. [Docket Item 19.] Plaintiffs consent to the dismissal of their claims under the FDCPA and RESPA [Docket Item 22], and the Court will therefore grant summary judgment with respect to Counts Five and Eight. An accompanying order will be entered.

Plaintiffs oppose the dismissal of their state law claims. No reply brief was filed in the case. Remaining before the Court are the claims asserting breach of contract (Count One); breach of the implied covenant of good faith and fair dealing (Count Two); negligent misrepresentation (Count Three); violations of the New Jersey Consumer Fraud Act ("CFA"), N.J.S.A. 56:8-1, et seq. (Count Four); slander of credit (Count Six); promissory estoppel (Count Seven); and negligent infliction of emotional

distress (Count Eight). The Court exercises jurisdiction over these claims under 28 U.S.C. § 1332.

## III. STANDARD OF REVIEW

At summary judgment, the moving party bears the initial burden of demonstrating that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once a properly supported motion for summary judgment is made, the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). In reviewing a motion for summary judgment, the court is required to examine the evidence in light most favorable to the non-moving party, and resolve all reasonable inferences in that party's favor. Hunt v. Cromartie, 526 U.S. 541, 552 (1999); Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007).

A factual dispute is material when it "might affect the outcome of the suit under the governing law," and genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The non-moving party "'need not match, item for item, each piece of evidence proffered by the movant,'" but must present more than a "mere scintilla" of

evidence on which a jury could reasonably find for the non-moving party. Boyle v. Cnty. of Allegheny Pennsylvania, 139 F.3d 386, 393 (3d Cir. 1998) (quoting Anderson v. Liberty Libby, Inc., 477 U.S. 242, 252 (1986)). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," no genuine issue for trial exists and summary judgment shall be granted. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted).

**IV. DISCUSSION**

   **A. The Entire Controversy Doctrine**

   Defendant Wells Fargo first argues that Plaintiffs' claims in this suit are barred by the entire controversy doctrine.

   New Jersey's entire controversy doctrine embodies the notion that "'the adjudication of a legal controversy should occur in one litigation in only one court.'" DiTrolio v. Antiles, 662 A.2d 494, 502 (N.J. 1995) (quoting Cogdell v. Hospital Ctr., 560 A.2d 1169, 1172 (N.J. 1989)). Under this principle, "'all parties involved in a litigation should at the very least present in that proceeding all of their claims and defenses that are related to the underlying controversy.'" Id. The entire controversy doctrine requires a party to bring in one action "all affirmative claims that [it] might have against another party, including counterclaims and cross-claims," or be forever barred from bringing a subsequent action involving the

same underlying facts. Rycoline Products, Inc. v. C & W Unlimited, 109 F.3d 883, 885 (3d Cir. 1997); Circle Chevrolet Co. v. Giordano, Halleran & Ciesla, 662 A.2d 509, 513 (N.J. 1995). A party "cannot withhold part of a controversy for later litigation even when the withheld component is a separate and independently cognizable cause of action." In re Mullarkey, 536 F.3d 215, 229 (3d Cir. 2008).

The entire controversy doctrine is applicable to foreclosure proceedings, but its application is narrower and extends only to "germane" counterclaims. Leisure Tech.-Northeast v. Klingbeil Holding Co., 349 A.2d 96, 98-99 (N.J. Super. Ct. App. Div. 1975). New Jersey Rule of Court 4:64-5 provides, in part,

> Unless the court otherwise orders on notice and for good cause shown, claims for foreclosure of mortgages shall not be joined with non-germane claims against the mortgagor or other persons liable on the debt. Only germane counterclaims and cross-claims may be pleaded in foreclosure actions without leave of court. Non-germane claims shall include, but not be limited to, claims on the instrument of obligation evidencing the mortgage debt, assumption agreements and guarantees.

N.J. Court R. 4:64-5. The New Jersey Supreme Court held in Leisure Technology that Rule 4:64-5 "undoubtedly was intended to limit counterclaims in foreclosure actions to claims arising out of the mortgage transaction which is the subject matter of the foreclosure action." Id. at 98. In that case, the defendants filed a counterclaim to a mortgage foreclosure action asserting

that the plaintiff's false representations to a development planning board subsequent to the execution of the mortgage caused defendants to lose out on an opportunity to sell some of their land and led to their inability to make mortgage payments. Id. at 97. The court found that the defendants' counterclaim was germane to the foreclosure action, because "the thrust of the counterclaim [was] the assertion that plaintiff had breached the underlying agreement in relation to which the mortgage was executed and interfered with defendants' rights under that agreement." Id. at 99.

Plaintiffs' claims in this case are not germane within the meaning of Rule 4:64-5 and consequently are not barred by the entire controversy doctrine. The claims in this case – including breach of contract, negligent representation, breach of good faith and fair dealing, fraud, and slander of credit – arise entirely out of Defendant's alleged promise in 2009 to provide a loan modification. By contrast, the subject of the foreclosure action was whether Plaintiffs had fulfilled their obligations under the 2003 mortgage contract. That question is separate from whether Defendant made a new loan offer in 2009 that Plaintiffs accepted and relied upon to their detriment. Although Plaintiffs' actions, in relying upon Defendant's promise of a loan modification, contributed to the foreclosure, "[a] causal relationship between the two sets of claims is not conclusive

under New Jersey Law" to bar litigation under the entire
controversy doctrine. <u>Fields v. Thompson Printing Co., Inc.</u>, 363
F.3d 259, 266 (3d Cir. 2004). Plaintiffs' claims in this suit –
and the asserted damages arising out of the failure to provide a
loan modification – have little to do with the enforceability of
the 2003 mortgage contract. Plaintiffs' claims are therefore not
barred by the entire controversy doctrine.

    **B. Summary judgment will be denied on Plaintiffs' breach of
contract claim based on Defendant's failure to evaluate
Plaintiffs for a loan modification.**

    Plaintiffs claim that they entered into a contract with
Defendant for a loan modification, and that Defendant breached
that contract when it failed to provide a loan modification with
a lower interest rate and failed to evaluate Plaintiffs for a
loan modification at all. (Pl. Br. 7-8.)

    A party alleging a breach of contract must establish (1)
the existence of a contract; (2) a breach of that contract; (3)
damages flowing from the breach; and (4) that he himself
performed his own contractual duties. <u>See</u> <u>Video Pipeline Inc. v.
Buena Vista Home Entm't, Inc.</u>, 210 F. Supp. 2d 552, 561 (D.N.J.
2002) (Simandle, J.) (citing <u>Pub. Serv. Enter. Group, Inc. v.
Phila. Elec. Co.</u>, 722 F. Supp. 184, 219 (D.N.J. 1989).

    Defendant argues that there were no other valid agreements
between the parties aside from the mortgage and note entered
into in 2003. They also argue that Plaintiffs were not entitled

to a HAMP loan. (Def. Br. 5-6.) Plaintiffs contend that whether
or not they were entitled to a loan under HAMP is irrelevant to
their breach of contract claim, which is based upon an agreement
for a loan modification in February 2009. Specifically,
Plaintiffs argue that Defendant offered a loan modification
program, orally and in writing, for "a new loan with a lower
interest rate ('as low as 2.5%') with lower monthly installment
payments," and Plaintiffs accepted the offer when they tendered
a check for $2,415.00. (Pl. Br. 7.)

　　　Defendant is entitled to summary judgment on Plaintiffs'
first breach of contract theory. Even after giving Plaintiffs
the benefit of all favorable inferences, the evidence is
insufficient to establish that Defendant promised to modify
Plaintiffs' loan.

　　　First, the February 6, 2009 letter from Defendant to
Plaintiffs clearly showed that Plaintiffs were merely being
considered for a loan modification. The letter specifically
stated that Defendant was "considering" Plaintiffs for a
modified loan, and further stated that it would "complete an
analysis of your situation" once it received the initial
$2,415.00 payment. Although the letter noted that Defendant
would "seek the appropriate approvals" once it received payment,
the language made clear that approval was not guaranteed. The
letter stated that Plaintiffs would receive further information

16

about the loan modification "[i]f the modification is approved," and also advised Plaintiffs that it "[was] not [a] guarantee or approval of the loan modification." Finally, it cautioned that "until such time as you are approved for a modification, normal default servicing will continue." (Def. Ex. E.)

Rowles' testimony provides additional evidence that Defendant did not promise a loan modification. Defendant's representative's notes regarding the February 6, 2009 phone call indicate that Plaintiffs were "pre-qual based on verbal information provided by the borrower, in which case they would then have to be reviewed for the mod[ification]." (Rowles Dep. 38:13-18.) The representative had also written, "Informed borrower that terms are not final. Terms may vary upon review and will be reviewed for modification." (Id. 35:25-36:2.) These notes suggest that Plaintiffs were specifically told by Defendant that further evaluation was required, consistent with the written advice in Defendant's February 6, 2009 letter above.

Finally, the evidence suggests that Plaintiffs themselves knew that they still needed to be approved for the loan modification even after they paid the $2,415.00. Plaintiff Lawrence Sarlo testified that after he sent Defendant the initial payment, he called several times to find out if Defendant needed any additional information. He also stated that he was still "waiting for a decision" when he called Defendant

again in June. (Lawrence Sarlo Dep. 76:11-21; 78:11-13.)

Given the evidence above, no reasonable jury could find that Defendant promised Plaintiffs they would receive a loan modification upon receipt of the initial payment. The Court finds that no valid contract for a loan modification had been formed.

The Court will, however, deny summary judgment on the breach of contract claim based upon failure to evaluate Plaintiffs for a loan modification. A reasonable jury could infer based on the evidence that there was an agreement between the parties to evaluate the Sarlos for a loan modification with a lower monthly payment. Here, Sarlo testified – and Defendant does not dispute – that Defendant told Plaintiffs over the phone that they were pre-qualified for a modified loan with an interest rate "as low as 2.5%" leading to lower monthly payments, and that Plaintiffs would be considered for the modification if they sent in an initial payment and were delinquent on loan payments.[5] Plaintiffs then sent in a check for the amount sought, which Defendant accepted, thus providing

---

[5] Although Plaintiffs assert that Defendant's representative told them to "stop making monthly payments" in order to qualify for a loan modification, Rowles denied that Wells Fargo representatives were told to encourage borrowers to be delinquent in the mortgage payments to get a loan modification. Regardless of the precise language Defendant used, neither party disputes that the prerequisite to applying for a loan modification was to be delinquent on loan payments.

consideration for the agreement to evaluate Plaintiffs' loan modification request. A reasonable jury could therefore find that Defendant made an offer which Plaintiffs accepted by tendering a check for payment.

Giving Plaintiffs the benefit of all favorable inferences, the evidence could also reasonably suggest that Defendant breached its promise to consider Plaintiffs for a loan modification specifically to lower their monthly mortgage payments. First, the evidence suggests that Plaintiffs never heard back from Defendant about the loan modification before Defendant initiated foreclosure on their home. Although Lawrence Sarlo admitted to being offered three loan options, none of them were for a loan with a lower monthly interest rate, which Defendant had promised to evaluate him for. One loan, the HomeSaver Advance loan, covered only Plaintiffs' past due mortgage payments and, according to Defendant's own documents, "[did] not affect the original mortgage at all." The other loan offer required a payment of $2,600 per month, nearly $1,000 higher than their original monthly payment. (Lawrence Sarlo Dep. 80:12-13.) When Sarlo objected that this was not the type of loan modification offer he had been promised, Defendant said it would come up with a reevaluation to see if Plaintiffs qualified for a lower interest rate or monthly payment. Although Defendant appeared to have finally evaluated Plaintiffs in June and

informed them that they did not qualify, that decision was mistakenly based on another person's income, which Defendant admitted when it told Plaintiffs over the phone that there was a "mix-up" in the files. Defendant then initiated foreclosure before it could assess whether Plaintiffs qualified for a reduced interest loan based on their actual income. Plaintiffs assert that they have never been given a decision on the loan modification, despite their initial payment.[6]

There is also evidence in the record to suggest that Defendant never bothered to conduct a proper evaluation for a loan modification, or that any final response was communicated to Plaintiffs. Sarlo stated that he called Defendant numerous times about the loan modification and was told each time that the process was still underway. He testified that Wells Fargo never even asked him for supporting documents regarding their income in the approximately four months before it initiated foreclosure. Defendant also never returned the initial payment of $2,415.00 which Plaintiffs submitted in 2009.

Based on this evidence, a reasonable jury could conclude that Defendant failed to properly assess whether Plaintiffs

---

[6] Although Rowles testified that Defendant evaluated Plaintiff for a HAMP loan for which Plaintiffs failed to qualify, Sarlo testified that he did not recall ever hearing anything about HAMP or whether he qualified for a HAMP loan. Plaintiffs do not argue that they were owed a loan modification evaluation under HAMP.

qualified for a loan with a lower interest rate and monthly payment, and breached its obligation to Plaintiffs. Accordingly, and because Defendant raises no other argument why this claim should be dismissed, the Court will deny summary judgment on the breach of contract claim based on a failure to evaluate Plaintiffs for a loan modification.[7]

### C. Plaintiffs' claim of breach of the implied covenant of good faith and fair dealing must be dismissed.

A covenant of good faith and fair dealing is implied in every contract in New Jersey, regardless of the type of contract at issue. See Wood v. New Jersey Mfrs. Ins. Co., 21 A.3d 1131, 1140 (N.J. 2011); Wilson v. Amerada Hess Corp., 773 A.2d 1121, 1126 (N.J. 2001); Sons of Thunder, Inc. v. Borden, Inc., 690 A.2d 575, 587 (N.J. 1997). The covenant of good faith and fair dealing provides that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract[.]" Kalogeras v. 239 Broad Ave., L.L.C., 997 A.2d 943, 953 (N.J. 2010) (citations and internal quotations omitted). A party breaches

---

[7] Plaintiffs state that they have suffered "adverse credit consequences" because of Defendant's breach, along with the loss of $2,415.00. Although the Court will allow Plaintiffs' claim to proceed because Plaintiffs have shown damages at least in the amount of $2,415.00, Plaintiffs will need to submit additional evidence at trial to prove damages beyond that amount as a result of Defendant's failure to properly evaluate them for a loan modification. It would be premature to rule out the possibility of damages beyond the $2,415.00 loss.

the implied covenant of good faith and fair dealing when it acts
in bad faith or engages in some other form of inequitable
conduct, even where there is no breach of the express terms of
the contract. Avatar Business Connection, Inc. v. Uni-Marts,
Inc., 2006 WL 1843136, at *7 (D.N.J. June 30, 2006); Kapossy v.
McGraw-Hill, Inc., 921 F.Supp. 234, 248 (D.N.J. 1996); see also
McGarry v. Saint Anthony of Padua Roman Catholic Church, 704
A.2d 1353, 1357 (N.J. Super. Ct. App. Div. 1998).

"[T]he [New Jersey] cases note a state of mind or malice-
like element to breach of good faith and fair dealing." Wilson,
773 A.2d at 1130 (quotations and citation omitted). To show bad
faith, "bad motive" by the defendant is essential, and "an
allegation of bad faith or unfair dealings should not be
permitted to be advanced in the abstract and absent improper
motive." Id.; see also Donnelly v. Option One Mortg. Corp., 2014
WL 1266209, at *16 (D.N.J. Mar. 26, 2014). Exercises of
discretion for "ordinary business purposes" do not constitute
improper motive, and a plaintiff cannot satisfy the "improper
motive" element by merely alleging that a defendant's
discretionary decisions benefitted the defendant and
disadvantaged the plaintiff. See Hassler v. Sovereign Bank, 644
F. Supp. 2d 509, 518 (D.N.J. 2009) (citing Elliott & Frantz,
Inc. v. Ingersoll-Rand Co., 457 F.3d 312, 329 (3d Cir. 2006));
Wilson, 773 A.2d at 1128.

Plaintiffs argue that Defendant breached its duty of good faith and fair dealing when it told Plaintiffs to stop making payments with the promise of a "pre-qualified" loan modification which it never delivered. (Pl. Br. 11.) Plaintiffs argue that Defendant knew that Plaintiffs would be tempted by the offer and encouraged Plaintiffs to cease mortgage payments in violation of the terms of their existing mortgage. (Id. at 11-12.)

The Court will grant summary judgment because no reasonable jury could find that Defendant acted in bad faith when they offered the loan program to Plaintiffs. Defendant did not reach out to Plaintiffs about the program; Sarlo testified that he was the one who first called Wells Fargo to ask about refinancing options. Nor is there any evidence that Defendant pressured Plaintiffs into applying or misrepresented the terms to make the program more enticing. Plaintiffs point to the fact that Defendant's representative told Plaintiffs that they were "pre-qualified" for the loan, which suggests that they should have received it, but the statement is not misleading or untrue. Defendant's letter regarding the loan modification made clear that it was not guaranteeing any particular interest rate or monthly payment, nor was it guaranteeing approval upon payment. Finally, contrary to Plaintiffs' suggestion, the Court can find no evidence that Defendant told Plaintiffs to cease mortgage payments knowing that it could not offer Plaintiffs a loan

modification and knowing that foreclosure would result. Because nothing in the record suggests that a reasonable fact finder could conclude that Defendant's decision was motivated by bad faith, the Court will grant summary judgment in Defendant's favor and dismiss Count Two.

### D. Plaintiffs' claim of negligent representation must be dismissed.

A claim for negligent representation under New Jersey law requires (1) an incorrect statement (2) negligently made, (3) upon which a plaintiff justifiably relied, (4) and which resulted in economic loss or injury as a consequence of that reliance. Mason v. Coca-Cola Co., 774 F. Supp. 2d 699, 704 (D.N.J. 2011) (citing H. Rosenblum, Inc. v. Adler, 461 A.2d 138, 142-43 (N.J. 1983)). Plaintiffs contend that Defendant was negligent in telling Plaintiffs that they were qualified for a loan modification when in fact further review needed to be completed.

The Court must dismiss Plaintiffs' claim because no reasonable jury could find that Defendant's statement to Plaintiffs was incorrect or negligently made. Plaintiffs' own assertion is that Defendant's representative told Plaintiffs that they were "pre-qualified" for a loan modification. (Pl. Br. 14.) But, as the term itself suggests, to "pre-qualify" someone for a loan is not a promise to provide them with the loan. The

24

representative noted to Plaintiffs that they could receive an interest rate "as low as" 2.5%, which further indicates that an assessment had not yet been completed and no firm offer had been made. Nor is there anything in the record to suggest that Plaintiffs believed they would automatically receive a lower-interest-rate loan upon tendering an initial payment. On the contrary, Plaintiffs' own testimony – that they were still "waiting for a decision" on whether or not they would receive a loan modification – suggests that neither party thought that approval was guaranteed. Furthermore, Defendant's call notes and its letter to Plaintiffs regarding the loan modification both show that the terms were not final and Plaintiffs' application required further review.

Because the evidence does not reasonably suggest that Defendant's statement that Plaintiffs were "pre-qualified" for a loan was a negligent misrepresentation, the Court will dismiss Count Three.

### E. A reasonable jury could find that Defendant violated the New Jersey Consumer Fraud Act when it failed to properly evaluate Plaintiffs for a loan modification.

The Consumer Fraud Act ("NJCFA"), N.J. Stat. Ann. § 56:8-2, is designed to address "sharp practices and dealings in the marketing of merchandise and real estate whereby the consumer could be victimized by being lured into a purchase through fraudulent, deceptive or other similar kind of selling or

advertising practices." <u>Daaleman v. Elizabethtown Gas Co.</u>, 390 A.2d 566, 569 (N.J. 1978). A claim under the NJCFA requires the plaintiff to establish (1) that the defendant engaged in an unlawful practice; (2) ascertainable loss; and (3) a causal relationship between the unlawful conduct and the ascertainable loss. <u>See</u> <u>D'Argenzio v. Bank of Am. Corp.</u>, 877 F. Supp. 2d 202, 208 (D.N.J. 2012); <u>Gonzalez v. Wilshire Credit Corp.</u>, 207 N.J. 557, 576 (2011) (quoting <u>Lee v. Carter-Reed Co.</u>, 203 N.J. 296, 521 (2010)). The "prime ingredient" of all types of consumer fraud is the capacity to mislead. <u>Cox v. Sears Roebuck & Co.</u>, 647 A.2d 454, 462 (N.J. 1994); <u>Fenwick v. Kay Am. Jeep, Inc.</u>, 371 A.2d 13, 16 (N.J. 1977). The Act is "remedial legislation which should be construed liberally." <u>Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co.</u>, 929 A.2d 1076, 1079 n.1 (N.J. 2007).

An "unlawful practice" is defined under New Jersey statute as

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission . . . .

N.J.S.A. 56:8-2. Unlawful practices fall into three general categories: (1) an affirmative misrepresentation, "even if unaccompanied by knowledge of its falsity or an intention to

deceive"; (2) an omission or failure to disclose a material fact, if accompanied by knowledge and intent; and (3) and violations of specific regulations under the NJCFA, which are reviewed under strict liability. See Cox, 647 A.2d at 462; DepoLink Court Reporting & Litig. Support Servs. v. Rochman, 64 A.3d 579, 587 (N.J. Super. Ct. App. Div. 2013).

There is sufficient evidence from which a reasonable jury could conclude that Defendant engaged in an affirmative misrepresentation. Despite assuring Plaintiffs that it would have a decision within six to twelve weeks about a loan modification under a more favorable interest rate, and despite accepting payment from Plaintiffs for that loan modification, Defendant never properly evaluated Plaintiffs for a new loan under the terms it had specified. Plaintiffs called Defendant numerous times and each time were told that the evaluation was proceeding, even though Defendant never requested any documents from Plaintiffs regarding their income. Although Defendant claims that it conducted an assessment and Plaintiffs failed to qualify, there is no documentary evidence showing that such an evaluation took place, or that the outcome was communicated to Plaintiffs. Defendant's claim is also contradicted by Plaintiffs' testimony that they were still waiting for a decision on the loan modification when Defendant initiated foreclosure. Defendant never returned Plaintiffs' initial

payment, which, under their offer letter, they were required to do if they failed to enter into a new loan agreement.

Under these facts, a reasonable jury could conclude that Defendant offered to evaluate Plaintiffs for a loan modification within twelve weeks; that this statement induced Plaintiffs to submit payment; and that Defendant failed to properly assess Plaintiffs as they said they would do. Defendant could reasonably be found to have engaged in misrepresentation under the NJCFA. See, e.g., DepoLink, 64 A.3d at 587 (noting that affirmative misrepresentations need not be accompanied by knowledge of its falsity or an intention to deceive); Monogram Credit Card Bank of Ga. v. Tennesen, 914 A.2d 847, 853 (N.J. Super. Ct. App. Div. 2007).

As there is also evidence that Plaintiffs incurred costs at least in the amount of $2,415.00 as a direct result of Defendant's conduct, Plaintiffs have presented sufficient evidence to overcome summary judgment on a NJCFA claim based on Defendant's failure to properly evaluate Plaintiffs for a loan modification. However, as the evidence does not show that Defendant made any guarantee to Plaintiffs about a getting a lower-interest-rate loan, Plaintiffs do not have such a claim under the NJCFA on those grounds.

**F. Plaintiffs' claim for slander of credit must be dismissed.**

Plaintiffs' claim for slander of credit must likewise be dismissed. A slander of credit claim is "a variation of a defamation claim." Cosmas v. Am. Exp. Centurion Bank, 757 F. Supp. 2d 489, 494 (D.N.J. 2010) (citing Biederman v. Mitsubishi Motors Credit of Am., Inc., 753 A.2d 1251, 1256 (N.J. Super. Ct. Law Div. 2000)). Plaintiffs' slander of credit claim appears to be based on the theory that the decline in Plaintiffs' credit rating was caused by Defendant's alleged instruction to Plaintiffs to stop making payments on their mortgage. There is no real dispute that Plaintiffs stopped paying their mortgage, and that the failure led to Defendant's foreclosure action, which in turn lowered Plaintiffs' credit score. Plaintiffs argue, however, that Defendant should be held liable because its wrongful actions caused Plaintiffs to stop their mortgage payments in the first place.

As the Third Circuit has noted, a plaintiff alleging slander of credit under New Jersey law must show "the publication, or communication to a third person, of false statements concerning the plaintiff, his property, or his business." F.D.I.C. v. Bathgate, 27 F.3d 850, 871 (3d Cir. 1994). An essential element of slander of credit claims under New Jersey law is the falsity of the statements communicated to a credit reporting agency. See, e.g., Biederman, 753 A.2d at 1256 (equating slander of credit claim to defamation claim and

stating that plaintiff must show that the statement made by defendant was false); see also Altoona Clay Prods., Inc. v. Dun & Bradstreet, Inc., 367 F.2d 625, 629 (3d Cir. 1966); Henry V. Vaccaro Const. Co. v A.J. DePace, Inc., 349 A.2d 570, 572 (N.J. Super. Ct. Law Div. 1975).

Bathgate is instructive in this case. There, the plaintiff filed a complaint to collect on the defendants' outstanding debt, and the defendant raised a number of counterclaims, including slander of credit. The Third Circuit affirmed the district court's dismissal of the slander of credit claim because the statement that defendants were in default was "accurate" and not false. In so holding, the Court observed that it did not matter that the defendants had a defense to their failure to pay, because "the existence of defenses to an action predicated on defaults merely excuses a defendant's failure to make a payment, but the defenses do not constitute payment." 27 F.3d at 871. Since defenses to default did not change the fact that the defendants were in default, the court held that the slander of credit claim was not actionable.

Similarly, in the present case, there is no genuine issue of material fact regarding whether Plaintiffs failed to make their mortgage payments or whether that failure resulted in foreclosure. Plaintiffs argue only that the failure was due to Defendant's wrongful conduct inducing Plaintiffs to stop making

their mortgage payments, but that is irrelevant to whether the information conveyed by Defendant was true. As there is no evidence that Defendant communicated any false statements regarding Plaintiffs' failure to pay their mortgage payments, the Court will grant summary judgment on the slander of credit claim and dismiss Count VI.[8]

### G. Plaintiffs' claim for promissory estoppel must be dismissed.

Plaintiffs additionally urge the Court to allow them to recover damages under the doctrine of promissory estoppel. Several conditions must be met in order for the doctrine of promissory estoppel to apply: The plaintiff must show that there was (1) a clear and definite promise (2) made with the expectation that the promisee will rely on it; (3) reasonable reliance; and (4) definite and substantial detriment. DeLuca v. CitiMortgage, 543 Fed. App'x 194, 197 n.4 (3d Cir. 2013) (quoting Toll Bros., Inc. v. Bd. of Chosen Freeholders, 944 A.2d

---

[8] The Court notes that New Jersey law requires that "[e]very action at law for libel or slander [] be commenced within 1 year next after the publication of the alleged libel or slander." N.J.S.A. 2A:14-3. As Plaintiffs' claim is based upon Defendant's improper conduct in 2009, it is likely barred by the statute of limitations. However, because Defendant did not raise this in a responsive pleading as an affirmative defense as required by Federal Rule of Civil Procedure 8(c)(1), and does not now raise it at summary judgment, the Court will deem the limitations defense waived. See Pondexter v. Dep't of Hous. and Urban Dev., 324 Fed. App'x 169, 171 (3d Cir. 2009); Chainey v. Street, 523 F. 3d 200, 209 (3d Cir. 2008).

1, 19 (N.J. 2008)).

Plaintiffs' sole argument is that Defendant promised to "provide a new loan to [Plaintiffs] for which they 'pre-qualified.'" But as the Court has already explained above, a reasonable jury could not infer from the evidence that Defendant made a clear and definite promise to Plaintiffs that they would receive a loan modification. Aside from the letter offer, which stated clearly that the letter was "not a guarantee or approval of the loan modification," Lawrence Sarlo's own testimony indicated that he believed a decision had never been made on whether he and his wife would receive a loan modification.

Accordingly, the Court will grant summary judgment in Defendant's favor and dismiss Count Seven of Plaintiffs' Complaint.

## H. Plaintiffs' claim for intentional infliction of emotional distress must be dismissed.

Plaintiffs' claim of intentional infliction of emotional distress will be dismissed. Under New Jersey law, a claim of intentional infliction of emotional distress requires a plaintiff to establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe. See Taylor v. Metzger, 706 A.2d 685, 694 (N.J. 1998); Buckley v. Trenton Sav. Fund Soc'y, 544 A.2d 857, 863 (N.J. 1988). Severe emotional distress refers to any type of severe and disabling

emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so. Taylor, 706 A.2d at 685. In order to prove severe emotional distress, the evidence must show that the distress was "so severe that no reasonable [person] could be expected to endure it." Buckley, 544 A.2d at 863 (internal quotations and citation omitted). In other words, it is not enough to establish that a party is acutely upset by reason of the incident; a plaintiff must show that the claimed emotional distress was sufficiently substantial to result in physical illness or serious psychological sequelae. See Turner v. Wong, 832 A.2d 340, 348 (N.J. Super. Ct. App. Div. 2003); Lingar v. Live-In-Companions, Inc., 692 A.2d 61, 67 (N.J. Super. Ct. App. Div. 1997). The severity of the claimed emotional distress involves questions of both law and fact. The court therefore decides in the first instance whether as a matter of law severe emotional distress can be found, and the jury then decides whether it has in fact been proved. Buckley, 544 A.2d at 864.

Plaintiff Lawrence Sarlo testified to mental anguish by stating that he and his wife lost many nights of sleep over the incident and that the phone call was "the worst phone call of my life." The loss of sleep and increased anxiety, however, is insufficient as a matter of New Jersey law to establish mental distress so severe that no reasonable person could be expected

33

to endure it. See, e.g., Buckley, 544 A.2d at at 864-65 (noting that mere allegations of "aggravation, embarrassment, an unspecified number of headaches, and loss of sleep" were insufficient to establish severe emotional distress); Harris v. Middlesex Cty. Coll., 801 A.2d 397, 406-07 (N.J. Super. Ct. App. Div. 2002) (no evidence of severe emotional distress even though plaintiff was unable to concentrate, cried excessively, and was physically unable to work on doctorate for at least a year because there was no evidence that the distress interfered with day-to-day activities, and no evidence that plaintiff sought counseling or treatment); Lascurain v. City of Newark, 793 A.2d 731, 748 (N.J. Super. Ct. App. Div. 2002) (declining to find severe emotional distress where plaintiff claimed that she became nauseous and upset, was depressed, had nightmares, and no longer enjoyed her daily activities because, despite physician's diagnosis of depression, there had been no dramatic impact on her everyday activities or her ability to function and she had not sought regular psychiatric counseling); Aly v. Garcia, 754 A.2d 1232, 1237 (N.J. Super. Ct. App. Div. 2000) (finding no severe emotional distress as a matter of law where plaintiffs did not seek medical treatment or counseling and there was no evidence of physical illness). Sarlo admitted that neither he nor his wife sought medical assistance for their emotional distress, and there is no evidence to suggest that they sought

34

counseling of any kind. Nor is there any evidence that Plaintiffs' mental distress caused physical illness or the development of a disabling mental condition.

Because the evidence is insufficient to establish that Plaintiffs suffered severe emotional distress, the Court will grant summary judgment and dismiss Count Nine.

## IV. CONCLUSION

For the foregoing reasons, the Court will deny Defendant's motion for summary judgment with respect to the claim of breach of contract (Count One) and violation of the New Jersey Consumer Fraud Act (Count Four), because there is a genuine issue of material fact whether Defendant failed to properly evaluate Plaintiffs for a loan modification. Defendant's motion for summary judgment will be granted with respect to all other claims. The accompanying Order will be entered.


**March 23, 2015**                         **s/ Jerome B. Simandle**
Date                                       JEROME B. SIMANDLE
                                           Chief U.S. District Judge